# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**AMERICAN NATIONAL PROPERTY &
CASUALTY COMPANY,**

        **Plaintiff,**

**v.**                                                 **Case No. 04-C-1185**

**MICHAEL A. GRAHAM,**

        **Defendant.**

# DECISION AND ORDER

The plaintiff, American National Property & Casualty Company ("ANPAC"), filed a complaint against Michael A. Graham ("Graham"), alleging that he violated certain terms of his agency agreements. Specifically, ANPAC alleges that Graham, after terminating his relationship with ANPAC, failed to return advance payments, misappropriated ANPAC's trade secrets, and violated their covenant not to compete.[1]

Pending before the Court are the parties' motions for summary judgment. Graham seeks summary dismissal of all claims against him. ANPAC seeks summary judgment solely on the claim that it is entitled to recover advance payments made to Graham.

---

[1] ANPAC also alleged that Graham violated his duty of loyalty by inducing its policyholders to cancel their policies with ANPAC. This allegation, though, is based on Graham's contractual obligation not to compete. The Court's determination, therefore, of Graham's contractual obligation not to compete will necessarily determine the fate of the breach of his duty of loyalty claim as well.

1

**BACKGROUND**

On November 1, 1999, Graham began working as an insurance agent for ANPAC. At around that time, Graham entered into two agreements with ANPAC: the Agent Agreement and the Agent Advance Agreement. Under the terms of these agreements, ANPAC agreed to pay Graham monthly advance payments of compensation in the amount of $9,000.00 per month. Graham was able to reimburse ANPAC these amounts in the form of commissions generated by his sale of ANPAC insurance policies.

The Agent Agreement also had a covenant not to compete and a provision related to trade secrets. The covenant not to compete provided that Graham could not induce the business of any of ANPAC's policy holders for one year after his termination. Furthermore, the Agent Agreement required Graham after termination to return all of the information and material that the Agent Agreement deemed "trade secrets."

On September 17, 2004, Graham terminated his relationship with ANPAC. Immediately upon his termination, ANPAC removed Graham's access to its computer system, which had detailed information concerning each of ANPAC's policy holders. However, less than a month after his termination, Graham submitted 79 cancellation requests from ANPAC policy holders to ANPAC. Each cancellation request indicated that an ANPAC policyholder working with Graham cancelled one or more policies with ANPAC.

In addition, at the time of his termination, the amount of advance payments paid by ANPAC to Graham exceeded the amount of commissions earned by Graham in the amount of $173,963.16.

**STANDARD OF REVIEW**

A court will grant summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. When considering the movant's case, the Court takes all inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Hall v. Bennett*, 379 F.3d 462, 465 (7th Cir. 2004). If the movant meets his burden, the nonmovant may not rest on the pleadings. Instead, the nonmovant must come forward with evidence that there is a genuine issue for trial that would support a reasonable jury verdict on every issue for which he bears the burden of proof at trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248 (citing *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)); *Celotex Corp.*, 477 U.S. at 322-24. If the nonmoving party bears the burden of proof on a matter at trial, and he is unable "to establish the existence of an element essential to [his] case," summary judgment is appropriate. *Celotex*, 477 U.S. at 322-23.

3

**DISCUSSION**

I.  Return of Advance Payments

Both parties move for summary judgment regarding the issue of whether Graham is contractually obliged to return $173,963.16 that he received from ANPAC in advance payments. Graham admits that he did not reimburse ANPAC this amount in the form of earned commissions. The question here, though, is not whether this amount was earned by Graham. Rather, the question is whether the agent agreements imposed a contractual duty upon Graham to return this money upon his termination.

ANPAC bases its breach of contract claim on Section I, Paragraph 7 of the Agent Agreement, which provides: "Repayment of Commissions. You agree to repay to the Company, on demand, any unearned commissions and all other compensation received by you for or with respect to premiums or payments returned to policy or contract owners by the Company for any reason." Plainly, this provision does not in any way apply to the advance payments Graham received. Rather, it refers to commissions or compensation "for or with respect to premiums or payments returned to policy or contract owners by [ANPAC] for any reason." That is to say, it refers to money Graham may have initially earned for ANPAC by selling a policy, but later, for whatever reason, ANPAC decided to return that money to the policyholder. In such a case, Graham must return the commissions he earned from that cancelled policy. Section I, Paragraph 7, therefore, simply is not relevant to ANPAC's claim that Graham is obliged to return advance payments upon his termination.

4

Nevertheless, ANPAC submits the affidavit testimony of Pat Leeper, who asserts that Section I, Paragraph 7 imposes upon Graham the duty to return advance payments. Putting aside the fact that Leeper never indicates in his affidavit what qualifies him to make such an assessment, it is also parole evidence that the Court cannot consider. It is well settled in Wisconsin law that a court may not examine extrinsic evidence when interpreting an unambiguous contractual provision. *See Piaskowski & Assoc. v. Ricciardi*, 275 Wis. 2d 650, 661 (Ct. App. 2004). Section I, Paragraph 7 is not subject to more than one reasonable interpretation. It unambiguously applies only to situations where ANPAC returns premiums or payments to policyholders.

Even if the Court could consider extrinsic evidence, though, that evidence would weigh in favor of demonstrating that Graham had no duty to repay advance payments upon his termination. For instance James Pettit, who recruited Graham to work with ANPAC, told Graham at the outset of his agency with ANPAC that he would not have to repay advance payments to ANPAC upon his termination.

In addition, in January 2003, ANPAC redrafted its Agent Advance Agreement to specifically require repayment of unearned advance payments upon termination. It specifies in Paragraph 6 that, upon termination, "the amount by which advances made by [ANPAC] exceed offsets received by [ANPAC] . . . shall be due and payable in full . . . after one year following termination . . . ." Graham was not a signatory of this Agent Advance Agreement. Rather, Paragraph 6 of the Agent Advance Agreement that Graham signed in 1999 merely

5

provides that, upon termination, Graham would not be "entitled to receive any payment and/or commissions from [ANPAC] after said date of termination." It is silent, as is the rest of the Agent Advance Agreement, as to the status of advance payments made to Graham prior to termination.

The Court must dismiss ANPAC's claim that Graham is liable for breach of contract by not returning advance payments to ANPAC. There simply is no contractual provision that triggers a duty for Graham to do so.

II.     The Covenant Not to Compete

The Agent Agreement also provides that in the event of termination, Graham must refrain for one year from inducing policyholders from cancelling or lapsing their ANPAC policies. ANPAC claims that Graham violated this provision, but Graham argues that this covenant not to compete is not enforceable under Wisconsin law.

In Wisconsin, covenants not to compete are "prima facie suspect," and "must withstand close scrutiny to pass legal muster as being reasonable." *Wausau Medical Center v. Asplund*, 182 Wis. 2d 274, 281 (1994). Specifically, five elements must be met for a covenant not to compete to be enforceable. The covenant must (1) be necessary for the protection of the employer; (2) provide a reasonable time restriction; (3) provide a reasonable territorial limit; (4) be reasonable as to the employee; and (5) be reasonable to the general public. *Id.* at 282.

6

In the instant case, the covenant not to compete does not provide a reasonable territorial limit. In fact, it provides no territorial limit at all. Rather, Section III.C of the Agent Agreement prohibits Graham, for one year after his termination, from inducing the business of "any policyholder" of ANPAC's, known or unknown, anywhere in the world. The lack of any geographical limitation makes the covenant not to compete over broad and, thus, unenforceable. *See Mutual Serv. Cas. Ins. Co. v. Brass*, 242 Wis. 2d 733, 743 (Ct. App. 2001) (holding that a restriction preventing a terminated insurance agent from soliciting "any policyholder" of his former employer was "over broad"). ANPAC's claim, therefore, that Graham violated the covenant not to compete must likewise be dismissed.[2]

III.  Misappropriation of Trade Secrets

Graham admits that after his termination, he used information from his monthly commission statements to solicit his former ANPAC policyholders. (Defendant's Proposed Finding of Fact ("DPFOF") ¶ 25.) The monthly commission statements were the property of Graham, and they contained the names of policyholders and the type of insurance policies that they purchased. (*Id.* at ¶ 20.) Customer lists that contain such basic information are not trade secrets under Wisconsin law. *See Burbank Grease Servs. v. Sokolowski*, 278 Wis. 2d

---

[2] Section V of the Agent Agreement provides that Graham may not "solicit or accept" business from any policyholder with whom he worked at ANPAC. This provision must be viewed together with Section III's prohibition that prevents Graham from inducing *any* policyholder, which is clearly over broad. If one part of a covenant is unreasonable, the Court cannot give effect to any other part of that same covenant. *See Streiff v. American Family Mut. Ins. Co.*, 118 Wis. 2d 602, 614-15 (1984).

7

698, 709(Ct. App. 2005), *rev'd on other grounds*, 294 Wis. 2d 274 (2006); *Corroon & Black-Rutters v. Hosch*, 109 Wis. 2d 290, 296-97 (1982).

For example, in *Corroon*, an insurance agent took a list of names, addresses, coverage amounts, and renewal dates with him after he stopped working with an insurance company. The Wisconsin Supreme Court held that the customer list was not a trade secret because it was "merely the outgrowth of normal marketing endeavors," and "the time and money expended . . . were spent on develop[ing] the market [that] the . . . list represent[ed], rather than on the compilation of the information." *Corroon*, 109 Wis. 2d at 297. The court also applied the six factors from the *Restatement of Torts*. Those six factors were: (1) the extent to which the information was known outside of the business; (2) the extent to which it was known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the case or difficulty with which the information could be properly acquired. *Id*. at 295 (citing Restatement, 4 Torts, § 757 cmt. b (1939)).

The relevant facts here mirror those of *Corroon*. Like the agent in *Corroon*, Graham took with him the names and types of coverage of ANPAC policyholders. Thus, it appears that the customer list that Graham retained, like the one in *Corroon*, was not a trade secret either.

8

However, Wisconsin enacted a statute after the holding in *Corroon* that codified the definition of a trade secret. Section 134.90(1)(c) defines a trade secret as information that has "independent economic value . . . from not being generally known to . . . other persons who can obtain economic value from its disclosure or use." Also, to be a trade secret, the information must be "the subject of efforts to maintain its secrecy that are reasonable under the circumstances." *Id*.

While the six factor test "no longer embodies the definition of trade secret," *Minuteman, Inc. v. Alexander*, 147 Wis. 2d 842, 857 (1989), the statutory definition is still similar to the old common law test. For instance, the first and fourth factors of the common law test also considered the extent to which the information was generally known and the economic value it would have to others. Also, the third and fifth factors took into account the efforts a business undertook to maintain the secrecy of the information. Not surprisingly, therefore, the Wisconsin Supreme Court asserted that the six factor test is still helpful in determining whether information is a trade secret because that test "was the basic source of [the statute's] definition of trade secret." *Id*. at 853.

Nevertheless, the Wisconsin Supreme Court also emphasized the difference between the statute and the old common law test. *Id*. at 852-53. In particular, the Wisconsin Supreme Court noted that the statute departed from the common law test by no longer requiring a trade secret to be "continuously used in one's business." *Id*. at 853.

9

Whether the customer list that Graham retained was "continuously used" in ANPAC's business is not an issue here. Thus, the difference between test employed in *Corroon*, and the one codified in section 134.90, is not a relevant difference that would distinguish the circumstances of this case from those in *Corroon*.

Even if the Court did not consider the holding of *Corroon*, a straightforward application of the statute necessarily leads to the conclusion that Graham did not retain a trade secret. ANPAC cannot demonstrate that the customer list that Graham took with him had an "independent economic value . . . from not being generally known to . . . other persons who can obtain economic value from its disclosure or use." Wis. Stat. 134.90. Rather, ANPAC focuses its argument on the value of the information in its computer database, which is clearly irrelevant because ANPAC admits that it terminated Graham's access to that database upon his termination. ANPAC fails to show how the information that Graham actually retained, that which was on his monthly commission statements, somehow had economic value because it was not generally known to others.

The information that Graham retained was not a trade secret. Accordingly, the Court must dismiss ANPAC's claim that Graham misappropriated its trade secret as well.

10

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

ANPAC's Motion for Summary Judgment (Docket No. 49) is **DENIED**.

Graham's Motion for Summary Judgment (Docket No. 30) is **GRANTED**.

The clerk is directed to enter judgment and close this case accordingly.

Dated at Milwaukee, Wisconsin this 8th day of March, 2007.

BY THE COURT

s/ Rudolph T. Randa
**Hon. Rudolph T. Randa
Chief Judge**

11

Case 2:04-cv-01185-RTR   Filed 03/08/07   Page 11 of 11   Document 72